*BROCKFNBROUGH, J.
The bond executed by Clendenin as principal, and Huston as surety, to Mayo, bears date as far back as 1782. After various efforts made bjr the creditor, he at length, in 1800, obtained a judgment against Huston the surety, who paid the amount of the debt on the 29th of May 1800. The supplemental bill by which Cantrii and wife, and the other daughters of Clendenin and their husbands, were made parties, was filed on the 21st of July 1827. That bill seeks to set aside certain deeds as voluntary and fraudulent, by which Clendenin had conveyed some slaves to his three infant daughters, for the consideration of love and affection, which deeds were admitted to record as early as May 1790. If the plaintiff has any right to set aside those deeds, and to subject the property conveyed by them to the payment of Huston’s debt due from the estate of Clendenin, that right accrued at least as early as May 1800, more than 27 years before the filing of the supplemental bill; and the defendants rely on the lapse of time as a bar to the recovery.
It was contended by the appellant’s counsel, that the plaintiff’s action did not accrue till he had established his debt against the rightful administrator; and as an excuse for not making this demand at an earlier period, it was stated, that shortly after it was ascertained from the commissioner’s report what was due, and then that there was not a sufficiency of other' assets to discharge the debt, this bill was filed against the fraudulent donees. It is well established at law, that the limitation begins to run from the moment that the cause of action accrues, and not from the time that it is ascertained that damage has been actually sustained by the breach of contract. Battley &c. v. Faulkner &c., 3 Barn. & Ald. 288; 5 Eng. C. b. R. 288, and Wilcox &c. v. Plummer’s ex’ors, 4 Peters 172, are strong cases to that effect, and I see no reason why the same rule should not prevail in equity. After the enjoyment of the property for 37 *years, and 27 years after the right of action, if any, accrued to the plaintiff, I think the title of the children ought not to be disturbed. The supplemental bill ought not to have been allowed, and was properly dismissed.
I concur with my brethren in the opinion, that as the bond on which the claim is founded does not bind the heirs of the obligors, no decree can be rendered against the children of Clendenin, to subject to the payment of this debt any land inherited by them, other than that on which Huston acquired a lien by the deed in the record mentioned: and that, by the very terms of that deed, Huston was bound to allow for that land at the rate of one dollar per acre.
I am for affirming the decree.
CARR, J.
The original bill in this case was filed to enforce a lien on a tract of land, given by Clendenin to Huston, in the form of a power of attorney to sell, but operating as a mortgage on the land. The bill was filed against the real and personal representatives of Clendenin, and on hearing, the court decreed a sale of the land. It was sold; and the report of the marshal shewing that it left a considerable part of the debt unpaid, the court (without confirming the report, as I understand the record) gave leave to file a supplemental bill, for the purpose of impeaching three deeds made by Clendenin to his daughters, conveying to them slaves and other chattels, and of having those slaves sold to pay the residue of the debt. Without acting finally on the original bill, the court proceeded to hear the supplemental bill, and dismissed it: from which dismissal this appeal is taken by the plaintiff.
I think this dismissal right, for several reasons. In the first place, I do not think that under the aspect of the case at the time, the court ought to have given leave to file the supplemental bill. Here was a specific subject ^pledged for the debt, and resorted to by the bill, and until that was fairly exhausted and shewn to be insufficient, there was no need and no propriety in seeking to condemn other property. Now, to my mind, this specific fund has by no means been shewn to be insufficient; on the contrary, the fact seems to be, that, properly disposed of, it would have discharged the debt and left a considerable surplus. The lien on the land, dated in December 1794, contains a stipulation between the parties that it should not be sold for less than one dollar per acre. This is prima facie evidence that, at that early period, the parties thought it worth that price. In the commissioner’s report, made in 1821, we find him representing '‘that from 600 to 1000 acres of this land is of the first quality for that country, and if sold in small tracts and on a reasonable credit, would probably produce five dollars per acre: but the balance thereof is worth but little.” This report was before the court when the last order of sale was entered. In 1822, Archibald Hutchinson makes oath that he is well acquainted with the land, and thinks it worth on an average one dollar per acre. And yet, in July 1822, this whole tract is set up and sold in a lump, and bought in by Huston the plaintiff at 30 cents per acre, making, to be credited to the decree, 870 dollars only; whereas, if it had been sold according to the suggestions of the commissioner, 800 acres of it would probably have brought 4000 dollars. I feel satisfied *588 that if this monstrous sacrifice had been-brought to the notice of the chancellor, he ■would have ordered a resale; this being strongly prayed for in the answers to the supplemental bill, and in itself most reasonable and proper. But the report seems never to have come under his notice: the subsequent proceedings are wholly taken up with the case made by the supplemental bill, answers and evidence, ending with the dismission of that bill, from which the appeal is taken.
*1 think this dismission correct, in the second place, on the ground taken by the chancellor; that the deeds from Clendenin to his daughters, though in their origin voluntary, and, while they continued so, assailable by creditors, yet became, by the marriage of those daughters, deeds for a valuable consideration, and from the dates of their marriages the daughters and their husbands' became purchasers for a valuable consideration, liable to no creditor of their father who had not, before such marriage, obtained, by judgment or otherwise, a specific lien on the property. That a deed voidable may be rendered valid and effectual by matter ex post facto, ■ is an undeniable proposition, and as old as the statute of Marlbridge. (See 2 Inst. 111.) In Prodgers v. Langham, 1 Sid. 133, a conveyance was made in trust for an only daughter for 21 years, to the intent that the profits before her marriage should be applied to her maintenance, and if she married with her father’s consent, then in trust for her during the rest of the term. The court held that the deed to the daughter was voluntary, and would have been void against the defendant, a subsequent purchaser for valuable consideration, if the marriage had not intervened; but when that took effect, the deed ceased to be voluntary, and became supported by a valuable consideration which was unimpeachable, inasmuch as the marriage was an advancement to the daughter, and the husband was induced (though that fact does not appear in the case) by the prospect of this provision. The cases of Kirk v. Clark, Prec. in Ch. 275, and East India Co. v. Clavell, Id. 377, are to the same effect, except that in these the marriage was had with notice by the husband of the deed, and in the first such notice was presumed. In Brown v. Carter, 5 Ves. 862, lord Alvanley reviews all the cases, and considers that proof of notice of the settlement before the marriage is not material. He says, “The lady had a right, the children have a right, *to have it considered that he had the estate which he appeared to have. Therefore I am of opinion, though it does not appear that the friends of the wife did speculate upon this and take it into consideration, it must be presumed they did act upon it, and the husband has not a right now to disturb it.” In the case of George v. Milbanke, 9 Ves. 190, sir Ralph Mil-banke had a power of appointment of ,£5000. to be raised under a trust term, and if he failed to appoint, then to his executors. In pursuance of this power, he directed that ,£500. should be paid to his natural son Mark Milbanke, and the rest of the ^5000. he appointed in favour of his natural children and their mother. Mark Milbanke (soon after the death of sir Ralph) in consideration of ¿£400. paid him by G. and P. assigned to them the ¿500. charged on the trust in his favour. Sir Ralph died in debt; and this bill was filed by a specialty creditor, also administrator with the will annexed, to have the ¿£5000. or so much as was not well appointed and disposed of by sir R. in his lifetime, raised and paid to the plaintiff. Lord chancellor Eldon said, it was too clear for argument, that the ¿4500. appointed to the woman and children was part of the personal assets of sir R. applicable .to the payment, of his debts, they being volunteers; but as to the ¿500. after a careful examination of the cases, he concludes thus: “This is an assignment, in equity merely, of a sum of money. But the question would be, whether the general creditors have a better equity than a purchaser of this specific part of the estate, having paid his money? And I think his the better equity. The son, as a volunteer, would hold it against every one but creditors; and the question is whether, being not a volunteer but a purchaser, creditors having no specific charge upon this property have as good an equity? I think they have not.” In his review of the cases, lord Eldon makes this remark upon Prodgers v. Langham: “In the case in Siderfin, the settlement *is expressed to be by covin. The reason is stated is this, that though a voluntary feoffment is bad as between the creditor and the feoffee, yet it is good as between the feoffer and feoffee; and therefore the latter, if prior, shall hold against the subsequent feoffee of the feoffor. The consequence is, that the feoffment of the voluntary feoffee is good against creditors.” In Sugden on Vendors, ch. XVI, (j 1, part III, (american edi. of 1836, vol. 2, p. 198, 9,) the author, having laid down the rule that a deed merely voluntary or fraudulent in its creation, and voidable by a purchaser, may become good by matter ex post facto, proceeds to cite the cases I have quoted, and remarks, “If a voluntary grantee gain credit by the conveyance to him, and a person is induced to marry him on account of such provision, the deed, though void in its creation as to purchasers, will, on the marriage being solemnized, no longer remain voluntary, as it was in its creation, but will be considered as made upon valuable consideration. And it is to be inferred” (he adds) “from a late decision” (referring to Brown v. Carter) “that though it does not appear that the friends of the wife did speculate upon the provision and take it into consideration, yet it must be presumed that they did act upon it; and it cannot afterwards be disturbed. ’ ’ In Sterry v. Arden, 1 Johns. Ch. R. 261, chancellor Kent remarks, “The marriage was a valuable consideration which fixed the interest in the grantee against all the world; she is regarded from that time as a purchaser, and as much so as if she had then paid an adequate pecuniarj' consideration. It has been a principle of long standing', and uniformly recognized, that a deed voluntary or fraudulent in its creation, and voidable by a purchaser, may become good by matter *589 ex post facto. It is the constant language of the books and of the courts, that a voluntary deed is made good by a subsequent marriage; and marriage has always been held *to be the highest consideration in law. Co. Hitt. 9 b. The cases do not require that the settlement should have been made with a view to any particular marriage; it is sufficient that the settlement was afterwards known to third persons, and was one probable inducement to the subsequent marriage. Indeed, in Brown v. Carter, lord Alvauley did not think it very material to prove that the marriage was even made with notice of the voluntary settlement, as the knowledge of the circumstances of the party, and the inducement, were to be presumed.” See 12 Johns. Rep. 536, where this case, on appeal, was unanimously affirmed; Spencer, J., delivering a most able opinion.
The three deeds in the case before us seem to have been ordered to record in open court, in Kanawha, on the day of their date (May 3, 1790), upon the motion of the grantor, — a circumstance calculated to give them much publicity; and it cannot be reasonably doubted that gentlemen inclined to address these ladies would in some way get notice of them. We know too that on the death of the grantor the slaves were taken into the separate possession of the daughters, and never inventoried as the property of their father. The daughters were all married after this, and of course with the slaves in their possession, and their deeds of record. How can it be doubted that their husbands had a knowledge of these notorious and open facts before their marriages?
It was said, however, that this defence of the marriage, and its operation as a purchase for value, was not pleaded, nor any way put in issue. It is true there is no plea, nor any formal defence on this ground ; but the facts are all stated and not at all contested — indeed stated in the bill itself. It was further insisted that Clen-denin, when he made these deeds, W'as not in a situation in which he could have made a marriage settlement in favour of his daughters that would have been valid, and therefore that the deeds could not be validated by *the subsequent marriages. I cannot admit either the position, or the consequence deduced from it. What was the situation of Clendenin when he made these deeds? We hear of no debt but that to Huston, and he was a creditor at large; or rather, there was no debt even to him, but a liability only, which did not become a debt until ten years after-wards, when he paid the money as surety. Will it be said that if, at the date of the deeds, Clendenin had sold bona fide and for a valuable consideration every slave he had, Huston could have disturbed such sale? And what is a settlement of slaves or other property upon a child in consideration of marriage, but a sale for a valuable consideration? Is not marriage the highest consideration, the most favoured? I have always seen it so laid down. Co. Hit. 9 b. ; 1 Bro. P. C. 244; 2 Id. 596; Mitford’s Plead. (4th edi.) 278. But let us take the case actually before us — the case of these deeds. Could Huston have set them aside? Never while he was a creditor at large; and he was no creditor till he paid the debt as surety, which was not till 1800. He must then have gotten a judgment and sued out execution before he could file a bill to impeach them. Instead of this course, he preferred to take a lien on the 3000 acre tract, then by his own admission an ample security for the engagement into which he had entered as the surety of Clendenin. This lien indeed was given to enable him to sell the land and meet the debt, and thus save himself from paying any thing out of his own pocket; and if he had used due diligence, it would seem that he might have effected this; for he received the power of attorney in 1794, and Clendenin did not die till 1797. But be this as it may, after taking this security, what had he to do with Clendenin’s personal estate? Could he tie it up in any way? Assuredly not. He stood merely as a surety bound for a debt and holding in his hands ample counter security. While he occupied this ground, ^Clendenin died; his daughters came into actual possession of the slaves, and married. This event, as the cases tell us, “fixed the interest of the grantees against all the world; from this moment they must be taken as purchasers, and as much so as if they had been paid an adequate pecuniary consideration.” This seems to me a complete defence against the claim set up in the supplemental bill; for surely if, at the times of the marriages, the slaves had been sold to a purchaser for their value in money, Huston could never have disturbed those sales.
I am also of opinion that the statute of limitations is a bar to the claim: but I have been so tedious upon the points already discussed, that I refer myself entirely to the view my brother the president has taken of this point, and the cases he I13.S cited
TUCKER, P.
In this case, Huston, the surety of Clendenin, having paid oil the debt after Clendenin’s death, claimed to be-substituted to the rights of the bond creditor against his heirs and personal representatives. His right to be so substituted' cannot be contested, and is not denied. But having failed to make his debt out of the personal estate in the hands of Clen-denin’s administrator, and the lands in the hands of his heirs, the appellant, the administrator of Huston, filed a supplemental bill, with a view to subject to his demand some slaves and other property in the hands of Clendenin’s daughters, which he conveyed to them in 1790, in fraud, as it is. alleged, of his creditors, and of Huston in particular.
The first defence set up by Cantril and others against this demand is, that the court has no jurisdiction of the subject. The court of chancery, however, very properly thought otherwise, and proceeded to consider the case upon another point, on which it gave judgment against the plaintiff by dismissing the bill. This was, *that although the deeds from Clen-denin to his daughters were fraudulent in their inception, they were made good by the subsequent marriage of the *590 daughters. That such would have been the effect of a marriage settlement cannot be questioned. Whether the mere marital rights of the husband would render valid an anterior fraudulent conveyance, is a broader question, upon which X do not feel prepared to pronounce, though the authorities indeed seem to sustain the proposition. Sterry v. Arden, 1 Johns. Ch. Rep. 261; Roberts on Fraud. Conv. 503, 508. Nor do I think it necessary to decide another question that has been made. It is contended that if a fraudulent donee, or any other who holds an estate subject to a charge, parts with it so as to withdraw it from the power of the creditor, the donee becomes personally liable for the demand. See Ferrars v. Cherry, 2 Vern. 384. If so, then it is said the femes covert here became, by the discharge of the property, debtors to its value, and the husbands have taken them and their property with that burden. Without, however, touching this question, or that upon which the chancellor dismissed the bill, I am satisfied it was properly dismissed on other grounds.
The defendants are charged on the ground of a fraudulent conveyance executed 37 years anterior to the exhibition of this charge against them, the fraudulent grantor having also been dead nearly 30 years before this assault upon his memory. There are two grounds on which the charge of fraud rests: first, that the conveyance was voluntary and without consideration ; secondly, that possession did not accompany the deed.
As to the first, I cannot think it sustained by any thing that appears in the cause. It is not every voluntary conveyance to a wife or child that is to be taken to be fraudulent. I admit it is said that as to creditors a voluntary conveyance is prima facia fraudulent. George v. Mil-banke, 9 Ves. 194. But such a conveyance, made *by a person not at all indebted, is certainly neither fraudulent nor void as to subsequent creditors, and the better opinion seems to me to be, that although the grantor may be somewhat indebted, yet if he be not embarrassed, or so greatly indebted as to afford evidence of fraudulent intent, the deed shall not be held void as to subsequent creditors. Hopkirk v. Randolph, 2 Brock. R. 132. It cannot be. sustained against antecedent creditors indeed, according to the opinion of very able judges, though others have thought otherwise. In the case of Salmon v. Bennett, 1 Day’s Connect. Rep. N. S. p. 525, the chief justice is reported to have said that “if there be no fraudulent intent, and the grantor be in prosperous circumstances, unembarrassed, and not considerably indebted, and the gift a reasonable provision for a child, leaving ample funds unincumbered for the payment of the grantor’s debts, the voluntary conveyance to the child will be valid against existing debts.” In these sentiments I fully concur, believing them to be the true exposition of the proviso of our statute which excepts from its operation conveyances upon good consideration and bona fide. If therefore the case required it, I should think it proper to look into this doctrine thoroughly, and to suggest to my brethren the propriety of settling, once far all, whether it really be the law of this land that no man can make a valid gift to a child, or settlement upon his family, which shall prevail against subsisting creditors, whatever may be his wealth or his unembarrassed condition. But that question does not, I think, necessarily arise in this case, athough the full handed situation of Clendenin when he made the gifts might bring him within the principles of the decision of Salmon v. Bennett, a - d although the actual and apparently voluntary execution of an instrument giving a lien for the debt on 3000 acres of land, satisfactorily proves the fairness and bona fides of Clendenin throughout these transactions.
*Without resting the case on these points, the length of time which has elapsed since the gift to the daughters, is, in my estimation, an insuperable barrier to the investigation of the alleged fraud in the conveyances. There is no principle more cherished in a court of equity than that which reprobates the entertainment of stale and antiquated claims. An equitable claim of 20 years standing is now considered as barred by length of time; and if the principle be just in relation to accounts and equities where there is no fraud alleged, it is still more just and proper where fraud is charged upon a defendant. It is not reasonable that after the lapse of 37 years a party should be called upon to answer to such a charge, unless it has been kept from .view by his own cunning and contrivance. 2 Sch. & Lef. 634; 2 Eq. Ca. Abr. 10, pl. 11. It has been strongly and truly said, indeed, that no time will prevent the “unkennelling of fraud:” but the pursuit must be prompt, or it will prove unsuccessful. It is not reasonable to call upon a party to explain a transaction, when the evidences of its fairness may have been swept into oblivion by the lapse of more than the third of a century. I am of opinion that the rule established both at law and in equity, which requires the party who charges the fraud to proceed within a given time after its discovery, is a just and proper rule, equally demanded by policy and a fair analogy to the statute of limitations, and equally applicable to cases of constructive fraud as to cases of actual fraud. I shall content myself with a simple reference to some of the cases on this subject, without making extracts from them; though the remarks of the chancellor, 2 Sch. & Lef. 633-639, are strikingly opposite to this case. Bree v. Holbech, 2 Doug. 656; 3 P. Wms. 143; 4 Bro. P. C. (by Tomlin) 163;
2 Sch. & Lef. 607; Mitford’s Plead. 212; (4th edi. 269;) 2 Eq. Ca. Abr. 10, pl. 11, and 4 Leigh 474, where the cases are cited by the bar in the argument.
*Now in this case the conveyances were made by the father to his daughters 37 3rears before the charge of fraud is brought forward, and 30 years after Clendenin himself was in his grave. It is not alleged in the bill that the fraud was recently discovered, nor is it possible so to conceive. The deeds of gift were recorded, and upon the death of Clendenin *591 in 1797, his children took possession, and part of the property at least was carried out of the state. If, as the law presumes, the creditor trusts his debtor upon the faith of the property which he sees in his possession, we must take it that the creditor here knew that Clendenin lived and died in the continued possession of this property, which he looked to for the satisfaction of his debt, and that immediately upon his death that property was removed from the hands of his personal representative, and claimed, held and eloigned by his children as their own. Pressed as Huston was by this claim, — committed as he was to close custody, and breaking jail as his only means of liberation, it is scarcely credible that he should not have diligently scrutinized the slate of Clendenin’s property, and asserted his claim to charge these slaves at an earlier period, had he not been conscious that the transaction was fair and meritorious. Cantrii, in his answer, alleges that there was a valuable consideration for the gift to his wife. 'Thirty-seven years ago this might perhaps have been proved, though it would be wonderful indeed if to this late day the testimony as to that fact has been preserved. I am therefore of opinion that it is now too late to question the transaction, and that after such a lapse of time it must be taken to have been unimpeachable.
This view of the case applies with not less force to the second ground of fraud alleged in the bill, namely, the fraudulent retaining of possession by the grantor in the deeds. That might have been accounted for 37 years ago, in various ways, however difficult it may be to ^explain it now. What right could Cantril’s wife (then a small child) throw upon the transaction? In his lifetime, Clendenin might have shewn that there was a valuable consideration for the gift, in which case the retaining possession by him for his children would have been held good, according to the case of Braxton v. Gaines & others, 4 Hen. & Munf. 151. But at this late day, such proof cannot be expected, and it would be unreasonable to demand it. It cannot be, that such a fact can be made the subject of examination at any period however remote.
It is said, however, that there is no manner in which the party sued as executor de son tort can protect himself at law from the creditor’s claim by relying on the lapse of time. I cannot assent to this. In the scanty materials which the books afford upon this subject, the question does not seem to have occurred, nor does there appear to be any precedent of a plea of the statute in such a case. I do not think such a plea could be sustained. But when, to the plea of no executor, the plaintiff replies that the defendant has taken possession of the goods of the decedent, the issue is made up on the question whether they are indeed his goods; and on the trial of that question, after a great lapse of time and an uninterrupted possession of the property, it would be competent and proper for the court to instruct the jury, that they might and ought to presume the delivery of possession, or an adequate excuse for its nondelivery. This principle of presumption from length of time has not been confined to the case of a bond or a mortgage: it has been extended even to the presumption of a deed or a patent, and among us, to the new and unprecedented case of a presumed compliance with the requisitions of our law against the importation of slaves into this commonwealth from adjoining states. George v. Parker, 4 Rand. 659. It is a principle of universal application, and essential to the ^protection of all rights which have been long and uninterruptedly enjoyed. The right to this protection cannot depend upon the form of action which the plaintiff may select. It must avail the defendant, in some form or other, in ever}' suit which may be instituted against him, assailing a right which he has held without question, until the evidence of its validity has been lost by the lapse of time.
Por these reasons I am of opinion that the supplemental bill was properly dismissed, and indeed that it ought never to have been permitted to be filed.
“The court is of opinion that there is no error in the decree dismissing the supplemental bill: but the court is of opinion that the heirs of the obligors in the bond from Clendenin and Huston to John Mayo jr. in the proceedings mentioned, not being bound to the obligee, they are not bound to Huston the surety who paid the debt and seeks to be subrogated, except under some specific lien which may have been given upon the lands; and the instrument giving the lien in this case providing expressly that the lands shall not be sold for a less price than one dollar per acre, the said Huston or his representatives cannot avail themselves of this lien, unless they or some other person will give an average of one dollar per acre for every acre in the tract. Therefore it is decreed and ordered that the said decree dismissing the supplemental bill be affirmed,” with costs to the appellees. And cause remanded to the circuit court of Augusta, “with directions to set aside the decree directing a sale of the land, and' to direct a resale on the conditions above mentioned, and also to set aside so much of the decrees as directed an account of the other real estate of Clendenin which descended to his heirs; and to be proceeded in to a final decree.”
*This decree was subsequently, during the same term, set aside on the motion of the appellant: and on his further motion, and suggestion of diminution in the record sent to this court, a writ of certiorari was awarded; upon the return of which it appeared, that in the transcript of the record originally certified, the following proceedings had been omitted — ■
On the 18th of June 1823, it was ordered, on the motion of the plaintiff, that if he should become the purchaser of the land directed to be sold by the former decree, the bond and security for the purchase money, required by that decree, might be dispensed with by the marshal, who was required to receive the bid of the plaintiff without such bond and security.
*592 On the 20th of December 1823, on the motion of the defendants b3r their counsel, and by consent of the plaintiff, it was ordered as follows: “that the marshal of the superior court of chancery holden at Lewis-burg, at any time before the next term, at the request of the defendants and at their proper costs and charges, make sale of the lands in the proceedings mentioned, in such lots or parcels as the said defend-antsmay direct, for ready money, having advertised the time and place of such sale in such manner as directed by the decree made in this cause, or for such time and in such manner as the defendants may direct. ’ ’ But it was understood and agreed “that the plaintiff shall be at liberty at the next term to take the benefit of such sale or sales, if he thinks proper, provided the whole land shall sell for less than the amount due to him, and if the whole product of all sales shall not be equal to the amount, the said marshal shall, instead of receiving the amount of the respective purchases from those who shall become the highest bidders,,, in money, take bonds with sufficient security from them respectively, to pay the sums of money due from them, when their titles *shall be confirmed by the decree of this court, and not otherwise.” And it was further ordered, by consent of the parties, “that the present cash prices of crop tobacco in the Petersburg market shall be the standard by which the sum due to the plaintiff shall be ascertained,” and that certain persons of the city of Richmond should determine such price, that is to say, determine at what price the quantity of tobacco due to the plaintiff could, at the date of the order, be purchased in the Petersburg market.
The following certificate of three mercantile firms of Petersburg was filed in the cause: “We hereby certify that a parcel of Petersburg passed tobacco might have been purchased in this market about the 28th of December last, say from 10 to 35,000 pounds, at 3 dollars and 50 cents per hundred pounds. Petersburg, 31st day of March 1824.”
On the 24th of July 1824, by consent of the parties, the privileges granted the defendants by the order made on the 20th of December 1823, were continued Until the next term.
To the marshal’s report, and to the sale made by him, the defendants excepted on two grounds: 1st, because the land was sold in Greenbrier, and not in Nicholas, the county in which it lay; 2dly, because the marshal did not furnish proof that the requisitions of the decree directing the sale had been complied with.
On the 19th of July 1827, the cause came on to be heard on the marshal’s report, and the defendants’ exceptions thereto; when the court overruled the exceptions, confirmed the report, and decreed that the marshal convey the land to the heirs of George Huston deceased.
The cause was again argued in April 1840, by Johnson for the appellant and Leigh for the appellees, before a court consisting of Tucker, P., and Brooke, Cabell, Parker and Stanard, J.
‘■■The questions mainly discussed at the bar, though not decided by the court, were, 1. Whether, supposing that the deeds from Clendenin to his daughters were voluntary and fraudulent as to creditors, the donees can avail themselves of the statute of limitations as a defence against the claim made by the supplemental bill? 2. Whether, under the circumstances of this case, the lapse of time, considered independently of the statute, will operate as a bar of the claim? On the first of these questions, the following authorities were cited and examined: Roberts on Fraud. Conv. 593; Hawes v. Leader, Cro. Jac. 270; S. C. Yelv. 196; Stamford’s case, 2 Leon. 223; Bethell v. Stanhope, Cro. Eliz. 810; Stoke’s case, 3 Leon. 57; Read’s case, 5 Co. 34a; Anonymous, 1 Salk. 313; Anonymous, Dyer 256a; 11 Vin. Abr.. Executors, F. a. pl. 9, p. 219; 13 Id. Fraud. C. pl. 5, p. 517; 1 Roll. Abr. C. 1, pl. 3, p. 549; Edwards v. Harben, 2 T. R. 587; Pierce v. Turner, 5 Cranch 154; Chamberlayne &c. v. Temple, 2 Rand. 384; 1 Williams on Ex’ors, pt. 1, bk. 3, ch. 5, p. 136, 9, 141, 2; 2 Saund. on Plead. 5, 6, 8, 9, [507, 510,] 104, [642, 3] ; Rastall’s Entries, p. 322; Osborne v. Rogers, 1 Wms. Saund. 264, and note 2, p. 265; Duppa v. Mayo, 1 Wms. Saund. 282, and note 2, p. 283; 1 Chitt. Plead. 422; 2 Id. 105, note a. ; 3 Id. 941, 2, and notes 1. m. n. o. ; 3 Id. 1162, 3; 2 Rob. Prac. 251, 2, and cases there cited; Rice v. White, 4 Leigh 474; Western v. Cartwright, 2 Eq. Ca. Abr. 10, pl. 11; Booth v. Earl Warrington, 4 Bro. P. C. (by Tomlins) p. 163; South Sea Company v. Wymondsell, 3 P. Wms. 143; Elam v. Bass’s ex’ors, 4 Munf. 301; Garland v. Enos, 4 Munf. 504; Spotswood v. Dandridge &c., 4 Hen. & Munf. 139; 11 Vin. Abr. Executors, F. a. 4, pl. 1, 2, p. 223. The cases referred to on the second question were the following: Hillary v. Waller, 12 Ves. 266-7; Prevost v. Gratz &c., 6 Wheat. 481; Ricard v. Williams, 7 Wheat. 59, 109, 115; Carr’s adm’r &c. v. Chapman’s legatees, 5 Leigh 164; Hayes &c. v. Goode &c., 7 Leigh 452. *Another question argued by the counsel was, 3. Whether the deeds from Clendenin to his daughters were in truth fraudulent as to Huston? But this point also was left undecided by the court.
The other questions discussed were, 4. Whether the ground on which the chancellor dismissed the supplemental bill, namely, that the deeds were made valid by the subsequent marriage of the donees, was correct? 5. Whether, upon this appeal from the decree dismissing the supplemental bill, the original bill and the proceedings thereon were properly examinable by the court? And if so, 6. Whether the obligation executed by Clendenin and Huston to Mayo bound the heirs of the obli-gors? 7. Whether the letter of attorney from Clendenin to Huston was revoked by the death of the grantor; or operated, notwithstanding that event, as a lien in equity on the land which Huston was thereby empowered to sell?
On the fourth question, the authorities referred to were those cited in the opinion of Carr, J., (delivered on the first argument of this case;) — on the fifth question, Madden v. Madden’s ex’ors, 2 Leigh 377; *593 Lomax v. Picot, 2 Rand. 247, and the other cases cited in 2 Rob. Pract. 433, — on the sixth question, 3 Bac. Abr. Heir and Ancestor, P. p. 458-9, — and on the seventh question, Paley on Agency, p. 133, [p. 186, 2d american, 3d London edi. ;] Clayton v. Fawcett’s adm’rs, 2 Leigh 19; Hunt v. Rousmaniere’s adm’rs, 8 Wheat. 174; 1 Peters 1, and Lepard v. Vernon, 2 Ves. & Beam. 51.
STANARD, J.
The propriety of the decree dismissing the supplemental bill depends on the solution of the following questions :
Were the conveyances made by Clendenin in trust for his daughters fraudulent in respect to existing creditors?
*If they were, has the property conveyed by them, or the responsibilities therefor, been discharged by the statute of limitations acting on the possession of the property, andón the appellant’s right of action against the donees, and thereby protecting the donees’ rights therein from the appellant’s claim; or by the marriage of the donees supplying a valuable consideration, and therebj' giving validity to the conveyances; or by the length of time that elapsed since the claim of the appellant accrued, and before the assertion of it against the donees by the supplemental bill?
I have no doubt that the conveyances were fraudulent in respect to the existing creditors of Clendenin whose claims cannot be satisfied without a resort to the property conveyed thereby; and the fullest proof that, at the time those conveyances were made, Clendenin had ample property (exclusive of that so conveyed) to pay all his debts, would not protect the donations from the claims of the then existing creditors. I fully assent to the doctrine deduced bj' chancellor Kent in the case of Reade v. Livingston, 3 Johns. Ch. R. 481, from the many cases on the subject, upon a careful review of them; which doctrine is thus stated by him: “The conclusion to be drawn from the cases is, • that if a party be indebted at the time of the voluntary settlement, it is presumed to be fraudulent in respect to such debts,” (that is, debts existing at the time of the settlement) ‘ ‘and no circumstance will permit those debts to be affected by the settlement, or repel the legal presumption of fraud. The presumption of law in this case does not depend upon the amount of debt, or the extent of the property in the settlement, or the circumstances of the party. There is no such line of distinction set up or traced in any of the cases. The attempt would be embarrassing if not dangerous to the rights of creditors, and prove an inlet to fraud. The law therefore wisely disables the debtor from making any voluntary settlement of his estate to *stand in the way of existing debts. This is the clear uniform doctrine of the cases.” Such too is the doctrine of the court of appeals in the case of Chamberlayne &c. v. Temple, 2 Rand. 384.
My opinion further is, that the property and the responsibilities therefor were not discharged in either of the modes suggested.
1st. The act of limitations does mot protect it from the claim of the appellant. It has been a concessum in the argument, that a party holding property under a vol-, untary conveyance which may be avoided by a creditor of the grantor, may, on the death of the grantor, be sued by the creditor as executor de sou tort. On the assumption that such suit may be brought, the limitation applicable to suits for the recovery of personal property, it is contended, is applicable in this case, and commences to run from the time such action might be brought; and when time has elapsed sufficient to protect the adverse possession of personal property from a suit to recover it, that time consummates the title of the donee in respect to the creditor, and the donee no longer holds the property, or is chargeable in respect of it, as executor de son tort. To this I cannot assent. The liability as executor cle son tort does, not subject the party to an action of detinue or trover by the creditor: the liability is to the action that the creditor might have against the rightful executor — the action of assumpsit or debt, if on a simple contract, of debt if on a specialty or judgment: and having incurred a liability to such actions, the only limitation by which he can protect himself from such liability is that which applies to the action to which he is so liable. The claim of the appellant could not have been barred by the statute of limitations, and the statute cannot give protection to the appellees.
2ndly. The marriage did not supply a valuable considera!ion, giving validity to the voluntary conveyance, ':iand exonerating the donees from the responsibility that existed previous to the marriage. The title that accrues to a husband in the personal property of his wife, by force of the marital right, has not the stability and strength of that of a purchaser for valuable consideration. The husband is invested, by force of the marital right, with the rights of property that his wife may have had in the personalty that he reduces to possession. His rights in such property are measured by hers. If acquired by her by covin, and that covin be secret, she might pass a good title to a purchaser for valuable consideration without notice ; but the marital right would not protect -the property. A secret trust, or an unrecorded mortgage, which would not protect it from the claim of such purchaser, would certainly not be defeated by the marital right. Marriage is an absolute gift to the husband of all the goods and personal chattels and estate which the wife was actually and beneficially seized or possessed of at that time in her own right, and of such other goods and personal chattels as came to her during marriage. 1 Roper on Husband and wife, p. 169. The husband is not a purchaser of the personal chattels of the wife. 7 Ves. 174. Again, the wife, at the time of her marriage, was liable to the action of the creditor. Her marriage cannot per se absolve her from that action. If, by force of the marriage, the title in the property be so changed as to protect it from specific charge, more certainly would a sale of it *594 by the donee, for valuable consideration, to a purchaser without notice, have that effect. Yet in the latter case it would hardly be pretended that the donee, by selling the property in respect to which she was chargeable as executrix de son tort, would absolve herself from such liability. In either view the liability to the creditor ,-wpuJd continue.
3dly. The lapse of time should not deprive the appellant of redress. It was proper for the appellant to *seek satisfaction out of the estate of the debtor, rather than attempt to obtain it out of the property conveyed to the donees. If he could have sued at law, charging the donees as executors in their own wrong, I think, with the appellant’s counsel, that proof of the insufficiency of Clendenin’s estate to pay his debts, unless aided by the property conveyed to the donees, formed an indispensable part of his case. The creditor resorting to a court of equity might have made the donees parties; but this he could not have done so effectually, unless he had charged that Clendenin’s estate, unaided by the property conveyed to the donees, was inadequate to satisfy his claim. Without such an allegation, it would not appear that he was hindered or defrauded by the conveyances, and that they were therefore void as to him; and the donees might have demurred. Row, at the time the suit was instituted, there was every probability, according to the view the parties took of the liabilities of Clendenin’s estate, that it would prove adequate; up to the order confirming the sale of the land; it was not ascertained to be inadequate, and during this time, the creditor was seeking to get satisfaction out'of the subject that in equity ought to have been primarily charged for the protection of the donees. Though the creditor might, on the suggestion of the insolvency of Clen-denin’s estate, have made the donees parties, he was not, against his own belief and the ostensible probabilities of the case, bound to do so, at the hazard of being subjected to costs to the donees, as I suppose he would have been, had the result shewn (as he had reason to expect it would do) that Clendenin’s estate was not insolvent, and his claim been satisfied out of that estate without touching the donations. The responsibility of the donees in equity was secondary and eventual, and the time consumed in the attempt to fix the charge on and procure satisfaction out of the estate primarily chargeable, and which was believed to be adequate, *cannot be computed in order to sustain the objection founded on the lapse of time, which operates only as evidence of satisfaction, or of abandonment or acquiescence. The donees cannot complain that that effort was made. It was necessary to fix the title of the creditor to a decree against them; and though they might have been made parties at an earlier date, had the creditor, against' the probabilities of the case, thought proper to hazard the suggestion that Clendenin’s estate was insolvent, yet that fact not being ascertained or believed, the creditor was not bound to suggest it, and conse- | quently not bound to make the donees parties at that time. I know of no case, or doctrine deducible from analogies, which would justify the discharge of an eventual responsibility, on the length of time consumed in the diligent pursuit of satisfaction from the fund primarily chargeable. Were an executor to assent to and deliver legacies without leaving funds to satisfy debts, the creditors might embrace the legatees in a suit against the executor, by making that suggestion. Yet it never has been supposed that if the' creditor pursues his claim against the executor, and at the end of a tedious litigation it is ascertained that he has not assets or abilitj' to pay the debt, the time consumed in this pursuit could be used to repel the suit against the legatees, instituted within reasonable time after such abortive pursuit. I forbear to extend the argument in support of my opinion that the supplemental bill ought not to have been dismissed, as the other judges, on different grounds, dissent from it.
The resulting questions are, 1st. Can the court, on this appeal from the dismission of the supplemental bill, examine the previous decrees, and correct them if they be erroneous? and 2dly. If this can bé done, are those decrees erroneous?
The cases referred to in 2 Rob. Prac. 433, leave no doubt that the first question must be answered in the affirmative.
*The solution of the second depends on the effect of the power of attorney, and of the obligation of the bond given by Clendenin to Mayo.
The obligation of the bond does not, in my opinion, extend to the heirs of the obli-gor, and the creditor therefore cannot charge the real estate, unless the power of attorney has given him a lien on the 3000 acres mentioned in it.
The case of Hunt v. Rousmaniere’s adm’rs, 8 Wheat. 174, which has been recognized by this court in the case of Clayton v. Fawcett’s adm’rs, 2 Heigh 19, is, I think, sound law, though in this case I apply it with the-more reluctance, seeing that by it the creditor will be deprived of a security which he and the court below, and one at least of the defendants, supposed to exist. Assenting to the law of that case after the fullest deliberation, the result is that the power of attorney expired with the life of Clendenin, and gave no lien after his death.
The decree therefore for the sale of the 3000 acres of land was erroneous, and all proceedings under it must be set aside, the land restored to the heirs of Clendenin, the conveyance of the marshal, made on the confirmation of the sale, cancelled, and a release or reconveyance, with special warranty, by Huston or those claiming under him as heirs, devisees or grantees, decreed to be made to the said heirs of Clendenin.